DANIEL G. BOGDEN
United States Attorney
ERIC JOHNSON
Chief, Criminal Division
JAMES M. TRUSTY
Chief, Organized Crime &
    Racketeering Section
RONALD CHENG
Special Attorney
        1200 United States Courthouse
        312 North Spring Street
        Los Angeles, California 90012
        Telephone:  (213) 894-8644
        Facsimile:  (213) 894-8601
        e-mail:     ronald.cheng@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEVADA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>            Plaintiff,<br><br>                v.<br><br>CHAOFAN XU<br>     (also known as YAT FAI HUI),<br>GUOJUN XU<br>     (also known as KIT SHUN HUI),<br>WAN FANG KUANG<br>     (also known as WENDY KUANG),<br>     and<br>YING YI YU,<br><br>            Defendants. | No. 2:02-cr-00674-PMP-LRL<br><br>GOVERNMENT'S RESENTENCING POSITION FOR DEFENDANTS CHAOFAN XU, GUOJUN XU, WAN FANG KUANG, AND YING YI YU (DEFENDANTS NOS. 1 THROUGH 4); MEMORANDUM OF POINTS AND AUTHORITIES<br><br>Date:  October 28, 2013<br>Time:  9:00 a.m. |

        Plaintiff United States of America, by and through its

counsel of record, the United States Attorney for the District

i

of Nevada and Special Attorney (Department of Justice, Organized Crime and Gang Section) Ronald Cheng, hereby files its Resentencing Position for Defendants Chaofan Xu, Guojun Xu, Wan Fang Kuang, and Ying Yi Yu (Defendants Nos. 1 Through 4).

The government's position is based upon the attached memorandum of points and authorities and declaration of Ronald Cheng, as well as the concurrently filed Submission of the Declaration of Ronald Cheng and Exhibits in Support of Resentencing Position for Defendants Chaofan Xu, Guojun Xu, Wan Fang Kuang, and Ying Yi Yu, and Resentencing Position Regarding Restitution for Defendants Chao Fan Xu, Guo Jun Xu, Wan Fang Kuang, and Ying Yi Yu.

Dated: October 2, 2013          Respectfully submitted,

                                DANIEL G. BOGDEN
                                United States Attorney

                                ERIC JOHNSON
                                Chief, Criminal Division

                                JAMES M. TRUSTY
                                Chief, Organized Crime &
                                    Gang Section


                                _____/s/_____
                                RONALD CHENG
                                Special Attorney

                                Attorneys for Plaintiff
                                UNITED STATES OF AMERICA


                                ii

# TABLE OF CONTENTS

**DESCRIPTION**                                                    **PAGE**

**MEMORANDUM OF POINTS AND AUTHORITIES**........................... 1

**I.    INTRODUCTION**............................................. 1

**II.   FACTUAL AND PROCEDURAL BACKGROUND**........................ 2

        A.   The Offense Conduct.................................. 2

             1.   The Gambling Trips.............................. 3

             2.   The 2001 Audit................................. 5

             3.   The Flight to the United States................ 6

             4.   The Arrests and Evidence Discovered in Searches 7

        B.   The Original Sentencings............................ 9

        C.   The Appeal.........................................11

**III. BASED ON THE FUNDS LAUNDERED OR ATTEMPTED TO BE LAUNDERED, THE OFFENSE LEVELS FOR DEFENDANTS CHAOFAN AND GUOJUN ARE 36 AND 35, RESPECTIVELY**......................................12

**IV.  THE FACTORS UNDER 18 U.S.C. § 3553 SUPPORT THE ORIGINAL SENTENCES IMPOSED THAT THIS COURT IMPOSED** ...............20

**V.   CONCLUSION** .............................................26

iii

1

**TABLE OF AUTHORITIES**

2
<u>CASES</u>:                                                             <u>PAGE</u>

3

4
<u>Gall v. United States</u>,
         552 U.S. 38, 128 S. Ct. 586 (2007)...................... 21
5
<u>United States v. Azeem</u>,
6       946 F.2d 13 (2d Cir. 1991)...........................12-13
7
<u>United States v. Booker</u>,
         543 U.S. 220, 125 S. Ct. 738 (2005)..................... 20
8
9
<u>United States v. Carty</u>,
         520 F.3d 984 (9th Cir. 2008) (en banc).................. 20
10
<u>United States v. Lichtenberg</u>,
11       631 F.3d 1021 (9th Cir.),
         <u>cert. denied</u>, 131 S. Ct. 2475 (2011)..................24-25
12
13
<u>United States v. Orlando</u>,
         553 F.3d 1235 (9th Cir. 2009)........................... 24
14
<u>United States v. Truong</u>,
         587 F.3d 1049 (9th Cir. 2009)........................... 25
15
16
<u>United States v. Xu</u>,
         706 F.3d 965 (9th Cir. 2013)....................... passim
17
<u>STATUTES</u>:
18
Title 18, United States Code:
19
         Section 1957...................................... 9, 11
20
         Section 3553...................................... passim
21
<u>SENTENCING GUIDELINES</u>:
22
         Section 2B1.1..................................... passim
23
         Section 2S1.1..................................... passim
24

25

26
                                   iv
27

28

**MEMORANDUM OF POINTS AND AUTHORITIES**

I.   **INTRODUCTION**

Defendants Chaofan Xu ("Chaofan"), Guojun Xu ("Guojun"), Wan Fang Kuang ("Kuang"), and Ying Yi Yu ("Ying Yi Yu") were convicted after a three-month jury trial of racketeering, conspiracy to transport stolen funds, conspiracy to commit money laundering conspiracy, visa fraud, and passport fraud offenses (Clerk's Record ("CR") 679).  On May 6, 2009, this Court sentenced defendant Chaofan to 25 years' imprisonment, defendant Guojun to 22 years' imprisonment, and defendants Kuang and Ying Yi Yu to eight years' imprisonment each.  (CR 742).  Each defendant's sentence also included three years' supervised release, $482 million restitution payable to the Bank of China ("BOC"), and a $600 special assessment.

Defendants appealed their convictions and sentences.  On January 3, 2013, the Court of Appeals for the Ninth Circuit affirmed defendants' convictions, and vacated the sentences and remanded for resentencing.  <u>United States v. Xu</u>, 706 F.3d 965 (9th Cir. 2013).  By this memorandum, the government submits its resentencing position, in which it requests this Court to recalculate the Guideline offense level and, from the recalculated offense level grant an upward variance from the range for defendants Chaofan and Guojun to the original terms of 25 and 22 years imprisonment, respectively.  The government does not request a change in the eight-year terms imposed on Kuang and Ying Yi Yu.  The government also requests restitution, as

described in its concurrently filed position regarding restitution.

## II. FACTUAL AND PROCEDURAL BACKGROUND

A. The Offense Conduct[1]

As the Court is familiar through the evidence at trial, as well as the filings that include the government's trial memorandum (CR 506), response to defendants' trial motions for judgments of acquittal (CR 655), and the government's original sentencing papers (e.g., CR 720, 737 (for defendant Chaofan)), as well as the Ninth Circuit opinion, 706 F.3d at 972-74, defendants engaged in a scheme to embezzle hundreds of millions of dollars from the Bank of China ("BOC"), transport substantial amounts of those funds to the United States, and enjoy those proceeds in this country through obtaining U.S. immigration status by fraud.

---

[1]   The following factual statement is based upon the government's answering brief filed in defendants' appeals. Citations to the record are provided for those portions that bear on the issue regarding calculation of loss discussed below. Given the volume of documents, it is not possible to include copies of all documents cited, but copies of documents relating to loss to BOC and to transfers to the United States are attached to the concurrently filed declaration of Ronald Cheng.

In the government's concurrently filed resentencing position regarding restitution, the government also addresses the objections made by defendants Chaofan and Kuang to their Pre-Sentence Reports at the original sentencing (CR 726, 736), including relevant citations to the trial record and other materials.

Defendants Chaofan and Guojun, as well as Zhen Dong Yu, served as heads of the BOC Kaiping sub-branch in the 1990s and exploited the auditing controls at the bank to cover unauthorized foreign exchange speculation and engage in fraudulent loans involving local Kaiping businesses.  The three diverted a large amount of the proceeds to Ever Joint, which was a conduit company in Hong Kong.  From Hong Kong, the three men, with their spouses, defendants Kuang (Chaofan's wife) and Ying Yi Yu (Guojun's wife), as well as Xu Hui Yu (Zhen Dong Yu's wife), lived in luxury apartments and took extravagant gambling trips to various destinations, including Las Vegas.  In the course of the scheme, each member of the group entered into a fraudulent marriage with a fake spouse holding United States immigration status, with the goal of escaping to the United States should the scheme be discovered.  In October 2001, the BOC discovered the massive deficit in their records, and defendants fled to the United States, where they remained until their arrests in this case.

       1.   <u>The Gambling Trips</u>

The three bank managers and their spouses traveled to Macao, Australia, Malaysia, the Philippines, and Las Vegas to gamble.  (RT [2/25/08] 192-94; RT [8/14/08 a.m.] 57-64).[2]  In 2000 and 2001, the three managers applied for United States

---

[2]   "RT" refers to the Reporter's Transcript, followed by the date of the proceeding and the page number.  "Ex." refers to the exhibits at trial, followed by the exhibit number.

visas in false names that they had previously used for purposes
of their fraudulent marriages.  (RT [9/19/05] 45-59; [8/19/08
a.m.] 77-87; Exs. 11, 126-131, 135).  Defendant Chaofan and
Guojun used those visas to enter this country on October 2,
2001.  (Ex. 135).  The managers, together with their spouses on
later occasions, flew to Las Vegas for gambling excursions.  (RT
[9/19/05] 45-59, 63-64; Ex. 135).

In Las Vegas, the group stayed primarily at Caesar's
Palace, where they received VIP services, including the top-
floor suite of a hotel tower.  (RT [2/25/08] 178-79, 183-92;
[8/14/08 a.m.] 59-60; [8/15/08] 6-16, 53-54).  Defendants
Chaofan and Guojun used visas in their false names at the
Bellagio, and defendants Kuang and Ying Yi Yu used the passports
they had obtained based on the false marriages described above.
(RT [2/25/08] 180-81; [8/11/08] 100-13; Exs. 180(1), 181(14)).
Defendants Kuang and Ying Yi Yu also used their passports at the
Paris casino.  (Exs. 179(2), 179(4)).  The game of preference
was baccarat, and all four defendants, along with Zhen Dong Yu
and Xu Hui Yu, gambled at the casinos.  (RT [2/25/08] 188-92;
[8/15/08] 6-59, 209-24; Exs. 181(1)-181(25), 183).

The money for gambling was delivered through
intermediaries, including Wa Po Kwong, who was defendant Kuang's
brother, and a gambling agent, Hon Chee Wong.  The group
typically brought in cashier's checks to establish a "front
money" account, that is, a credit line.  (RT [2/25/08] 192;
[8/11/08] 113-22; [8/12/08 p.m.] 241-48; [8/15/08] 18-24, 50-59,

209-24; [8/20/08 p.m.] 206; Exs. 180(2)-180(6), 181(7), 181(20)-181(23), 183, 244).  The transfers attributable to Ever Joint, defendant Chaofan, or defendant Guojun included a set of checks, dated September 30, 2000, and totaling $2,000,000 payable to Wa Po Kwong and a separate $600,000 check payable to Hon Chee Wong that were used as credit at the Bellagio casino, after which checks were issued to the members of the group.  (RT [8/11/08] 113-16; Exs. 180(2), 244).

For Caesar's Palace, from February 1999 to October 2001, defendants Chaofan and Guojun, as well as Zhen Dong Yu and an associate of Wa Po Kwong, brought checks, some of which were from the Bellagio activity described above and other casino activity, to serve as "front money" for their play.  (RT [8/15/08] 21-29, 50-59; Ex. 181(7), 181(20), 181(21), 181(22), 181(23)).  Defendant Chaofan lost $6 million in various trips to Caesar's Palace from September 2000 to October 2001, with baccarat wagers as high as $100,000 a hand; defendant Guojun lost approximately $500,000 during those trips; defendant Kuang won approximately $50,000; and defendant Ying Yi Yu lost approximately $450,000.  (RT [8/15/08] 30-40; Ex. 181(8), 181(9), 181(11), 181(13); 181(15)).

During a trip to Las Vegas in May 2001, Chaofan and Guojun arranged a flight to Los Angeles International Airport to complete paperwork for their fraudulent marriages with their fake spouses at the airport restaurant.  (RT [7/18/08] 197-204; [7/22/08] 17-22, 108-13; [8/25/08] 42-49; Exs. 118, 119).

2.   The 2001 Audit

In 2001, due to a change in auditing reporting methods, the BOC headquarters and provincial branches directly reviewed balances and sent directions to the second-level branches and sub-branches that they supervised.  On October 12, 2001, the Guangdong provincial branch discovered a $482 million discrepancy in the interbranch account, and this discrepancy was attributable to the Kaiping sub-branch, which was managed at that time by defendant Guojun.  (RT [6/11/08] 87-89; RT [6/27/08] 33-37).  As further discussed in the concurrently filed government's restitution position, an audit identified and documented the components of the loss that totaled $482 million.

3.   The Flight to the United States

In October 2001, after a gambling trip to Las Vegas, the group returned to Los Angeles, and defendants Chaofan and Guojun, along with Zhen Dong Yu, went back to China.  (RT [8/14/08 a.m.] 65-66).  Afterwards, defendant Chaofan told Zhen Dong Yu that the fraud had been discovered.  (RT [9/20/05] 118-19).  Defendants Chaofan and Guojun, as well as Zhen Dong Yu, were in Kaiping, and they fled to Hong Kong.  (RT [9/20/05] 118-19).

In Hong Kong, Zhen Dong Yu sent wire transfers of $3.5 million to his brother in San Francisco, $1 million to an acquaintance in Canada, and $1.1 million to the Hong Kong office of Caesar's Palace, and also obtained a $1.2 million cashier's check for himself.  (RT [9/20/05] 122-25; [8/19/08 a.m.] 111-12;

Ex. 17).  Defendants Chaofan and Guojun also made wire transfers.  (RT [9/20/05] 124-25).  These funds from Hong Kong were connected to money stolen from BOC.  (RT [9/20/05] 120-21).  Zhen Dong Yu carried on his person the $1.2 million check, and defendant Guojun carried approximately $700,000 to $800,000 in checks.  (RT [2/25/08] 172-74).

The three managers, along with the gambling agent, flew from Hong Kong to Vancouver on October 15, 2001, where they entered using documents with their false names.  (RT [9/20/05] 125-26; [2/25/08] 169-74).  After arriving in Canada, defendants Chaofan and Guojun flew on a Caesar's casino jet to Las Vegas to gamble and to obtain cash.  (RT [9/20/05] 126-27; [2/25/08] 200-01; [8/15/08] 184-90; [8/19/08 a.m.] 126-27; Ex. 182).  In doing so, they used the visas in the false names of Yat Fai Hui and Kit Shun Hui to enter the country.  (Exs. 135).  The three had wired a total of over $8 million to Caesar's Palace, but defendants Chaofan and Guojun discovered that the transfers had been frozen.  (RT [2/25/08] 201-03; [8/15/08] 184-90).

In the meantime, Zhen Dong Yu's true spouse (Xu Hui Yu) and fake spouse (Shanna Ma) flew to Hong Kong to collect belongings and to meet Kuang and Ying Yi Yu (along with their children) and fly from Hong Kong to Vancouver.  With the assistance of a lawyer and paralegal who had arranged Zhen Dong Yu's false marriage and the marriages at Los Angeles International Airport that were described above, defendants, along with Zhen Dong Yu

and his spouse and all the defendants' children, entered the United States.

    4. <u>The Arrests and Evidence Discovered in Searches</u>

  The group initially stayed in the Los Angeles area, but defendants Chaofan, Guojun, Kuang, and Ying Yi Yu moved to Wichita, Kansas, with defendants Chaofan and Kuang subsequently moving to Edmond, Oklahoma.  Zhen Dong Yu was arrested in Los Angeles on December 19, 2002, and pleaded guilty to federal charges and agreed to return to China, where he was convicted of embezzlement and illegal use of state property and sentenced to 12 years imprisonment.  Xu Hui Yu also pleaded guilty to a federal offense of marriage fraud, but was not required to return to China.

  Law enforcement arrested defendants Guojun and Ying Yi Yu in Wichita, Kansas, on September 22, 2004.  Law enforcement arrested defendants Chaofan and Kuang near their residence in Edmond, Oklahoma, on October 6, 2004.  Defendant Chaofan, who initially identified himself as "Johnny Hui," tried to run away after being handcuffed.  Defendant Kuang, after she had been arrested and placed in a police car, spoke with a neighbor and told her, in a Chinese-language conversation that was recorded within the police car, to go get the money from the refrigerator and storage cabinet or else "they will go search for it."  On executing a search warrant for the residence, law enforcement discovered, among other things, jewelry and cash totaling $154,000, including $20,000 hidden in a freezer in the garage,

$20,000 to 30,000 in a kitchen pantry, $20,000 in a bathroom vanity cupboard, $30,000 in the kitchen refrigerator, and $10,010 in a bag in the master bedroom closet.

B.   The Original Sentencings

Defendants were convicted of all of the racketeering, international transport of stolen money conspiracy, money laundering conspiracy, and immigration fraud charges against them.  The Court determined the Guideline offense level based on the following calculations:

| DESCRIPTION | | | LEVELS |
|---|---|---|---|
| Base offense level (based on cross-reference to § 2B1.1) (§ 2S1.1 (a)(1)(A)) | Base (§ 2B1.1(a)(2)) | 6 | 40 |
| | Loss ($482 million) (§ 2B1.1(b)(1)(P)) | 30 | |
| | Relocating to another jurisdiction, scheme from outside the United States, sophisticated means (§ 2B1.1(b)(9)) | 2 | |
| | Deriving more than $1 million from financial institution (§ 2B1.1(b)(13)(A)) | 2 | |
| | SUBTOTAL | 40 | |
| Conviction under 18 U.S.C. § 1957 (§ 2S1.1(b)(2)(A)) | | | 1 |
| NET OFFENSE LEVEL FOR | | | 41 (324 to |

9

| DESCRIPTION | LEVELS |
|---|---|
| DEFENDANTS KUANG AND YING YI YU | 405 months) |
| Role | 4 (Chaofan) / 3 (Guojun) |
| Abuse of position of trust | 2 (Chaofan and Guojun) |
| NET OFFENSE LEVEL FOR DEFENDANTS CHAOFAN AND GUOJUN | 43 (maximum under Guideline table) |

After making these findings, the Court determined under 18 U.S.C. § 3553(c) that, balancing the need for a "severe penalty" with sentencing disparity in view of the 12-year sentence that codefendant Zhen Dong Yu received, there should be a variance downward from the Guideline term of 65 years imprisonment (the statutory maximum applicable for the Guideline range of life imprisonment) and imposed sentences of 300 months' imprisonment for Chaofan and 264 months' imprisonment for Guojun.  In doing so, the Court found that defendant Chaofan was the "architect" of a "sophisticated scheme to defraud BOC of enormous sums of money" and "played a significant part in encouraging others to become a part of the scheme to defraud."  While Guojun was less culpable and had a lesser leadership role than defendant Chaofan or Zhendong Yu, the Court emphasized the importance of punishing individuals who commit crimes in foreign countries and then flee to the United States in order to avoid penalty for those crimes.

(RT [5/6/09] 80-81).   The Court also imposed a $482 million restitution order, reflecting the loss to BOC.

C.   <u>The Appeal</u>

Defendants appealed their convictions and sentences.   In a published opinion, the Ninth Circuit affirmed the convictions but vacated the sentences and remanded for resentencing.   The Ninth Circuit initially rejected defendants' contention that the 2007 edition of the Sentencing Guidelines should not be applied to their sentencings and noted that there was a "single RICO conspiracy with two purposes:   the Bank of China fraud and immigration fraud."   706 F.3d at 989-91.   The Ninth Circuit also held that it was error to apply Guideline Section 2S1.1(a)(1) to the sentencings, which calculates the base offense level upon the offense level for the underlying offense, because "foreign conduct cannot be used to meet the requirements" of the Guideline.   <u>Id.</u> at 992-93.   The Ninth Circuit thus remanded for sentencing under Section 2S1.1(a)(2), which applies a base offense level of 8 plus the number of offense levels from the Section 2B1.1 loss table corresponding to the value of the laundered funds.   <u>Id.</u>

The Court also rejected defendant Chaofan's objection to the abuse of a position of trust enhancement under Section 3B1.3, but sustained the objection to the one-level enhancement for a conviction for 18 U.S.C. § 1957 under Section 2S1.1(b)(2)(A).   <u>Id.</u> at 993.

11

With regard to the restitution order, the Ninth Circuit held that the $482 million figure was infirm in that a reference to Guideline calculations was not sufficient to support the restitution figure, since restitution must be based on actual loss. Id. at 994. The Ninth Circuit accordingly remanded for reconsideration of restitution (this issue is addressed in the government's concurrently filed resentencing position regarding restitution).

**III. BASED ON THE FUNDS LAUNDERED OR ATTEMPTED TO BE LAUNDERED, THE OFFENSE LEVELS FOR DEFENDANTS CHAOFAN AND GUOJUN ARE 36 AND 35, RESPECTIVELY**

The Ninth Circuit remanded for resentencing under Guideline Section 2S1.1(a)(2). Section 2S1.1(a)(2) provides a base offense level of 8 "plus the number of offenses from the table in § 2B1.1 . . . . corresponding to the value of the laundered funds . . . ." "Laundered funds" is defined as "the property, funds, or monetary instrument involved in the transaction, financial transaction, monetary transaction, transportation, transfer, or transmission in violation of 18 U.S.C. § 1956 or § 1957." U.S.S.G. § 2S1.1, comment. (n.1). Given that the offenses of conviction included Count Two, money laundering conspiracy, which included both engaging in and attempting to engage in monetary transactions in fraud proceeds, it is appropriate to consider all transactions within the scope of the conspiracy, whether or not consummated.

The only limitation is the Ninth Circuit's ruling that "applying the relevant conduct analysis to Defendants' foreign

conduct is not permissible." 706 F.3d at 992.  In doing so, the Ninth Circuit relied on United States v. Azeem, 946 F.2d 13 (2d Cir. 1991), in which the Second Circuit upheld the district court's reliance on a kilogram of heroin imported from abroad into New York for purposes of calculating a drug sentence, but held that the "foreign crime" of a three-kilogram delivery from Pakistan to Cairo, Egypt, should not be used.  Azeem, 946 F.2d at 17.  The Ninth Circuit here elected to follow the Second Circuit in Azeem.  706 F.3d at 993.

Similar to Azeem, defendants' conduct involved both embezzled amounts that were transferred from one foreign location to another foreign location, as well as amounts that defendants transferred (or attempted to transfer) from overseas into the United States.  At trial, casino witnesses described the business records that documented the trips from March 1999 to October 2001, which included the exhibits that documented the checks and transfers that supported defendants' multi-million dollar gambling activities.  In addition, Zhen Dong Yu testified to particular transfers and checks that the defendants sought to bring and cause to be sent to the United States when the defendants fled from China to this country.  Those amounts that defendants transferred or attempted to transfer to the United States are summarized in the table in the concurrently filed declaration of Ronald Cheng (at ¶ 4) and total over $20 million, which is reproduced below:

//

| DATE | RECIPIENT | DESCRIPTION (ATTEMPTED TRANSFERS IN BOLD TYPE) | AMOUNT |
|---|---|---|---|
| 03-02-99 | Caesars Palace | Bank of China check H182363 for HKD 3,821,400.00 (at foreign exchange rate of 7.75 HKD = 1 USD) (Trial Exhibit 181(7), page BOC-14819) | $493,083.87 |
| 09-29-00 | Bellagio | Westpac check for AUD 500,000 (at foreign exchange rate of 1.791473 AUD = 1 USD) (Trial Exhibit 180(3), page BOC-15080) | $279,100.00 |
| 09-30-00 | Bellagio | Hua Chiao Commercial Bank check 50009484 (Trial Exhibits 180(3), page BOC-15080) and 180(5), page BOC-15078; source Ever Joint (RT [8/12/08 p.m.] 242-43; requested by Chaofan from Ever Joint as loan to Wah-Po Kwong, payable to Wong Hon Chee (RT [8/12/08 p.m.] 247-48) (Trial Exhibit 244, appendix XVIII.8) | $500,000.00 |
| 09-30-00 | Bellagio | Hua Chiao Commercial Bank checks 50009485 through 50009488 (four checks) (Trial Exhibit 180(2), page BOC-15064); requested by Chaofan from Ever Joint as loan to Wah-Po Kwong (Morris testimony; RT [8/12/08 p.m.] 246-47) | $1,921,721.88 |
| 04-27-01 | Caesars Palace | Shanghai Commercial Bank cashier's check (Trial Exhibit 181(21), page BOC-14888) | $450,000.00 |

14

| DATE | RECIPIENT | DESCRIPTION (ATTEMPTED TRANSFERS IN BOLD TYPE) | AMOUNT |
|---|---|---|---|
| 04-27-01 | Caesars Palace | Hang Seng Bank demand draft (Trial Exhibit 181(21), page BOC-14888) | $450,000.00 |
| 05-07-01 | Caesars Palace | Bank of America check 998 (Trial Exhibit 181(21), page BOC-14895) | $1,000,000.00 |
| 05-23-01 | Caesars Palace | Transmittal from Hong Kong (Trial Exhibit 181(21), page BOC-15141) | $420,000 |
| 09-28-01 | Caesars Palace | Bank of America transmittal of office deposits (Trial Exhibit 181(22), page BOC-14901) | $1,000,000.00 |
| 10-06-01 | Caesars Palace | Standard Chartered Bank Hong Kong draft (Trial Exhibit 181(22), page BOC-14490) | $500,000.00 |
| 10-06-01 | Caesars Palace | Standard Chartered Bank Hong Kong draft (Trial Exhibit 181(22), page BOC-14490) | $500,000.00 |
| 10-06-01 | Caesars Palace | Hua Chiao Commercial Bank draft (Trial Exhibit 181(22), page BOC-14490) | $300,000.00 |
| **10-15-01** | **Desert Palace (Caesars Palace and Paris)** | **Zhen Dong Yu transfer for HKD 8,859,292 to Wong Hon Chee account at Desert Palace (at foreign exchange rate of 7.75 HKD = 1 USD) (Trial Exs. 181(23) and 244 (at appendix XVI.9)) (testimony of Rob Morris, RT [8/12/08 p.m.] 243-46)** | **$1,141,661.34** |

| DATE | RECIPIENT | DESCRIPTION (ATTEMPTED TRANSFERS IN BOLD TYPE) | AMOUNT |
|---|---|---|---|
| 10-15-01 | Desert Palace (Caesars Palace and Paris) | **Guojun transfer for HKD 43,738,367 to Wong Hon Chee account at Desert Palace** (at foreign exchange rate of 7.75 HKD = 1 USD) (Trial Exs. 181(23) and 244 (at appendix XVI.9)) (testimony of Rob Morris, RT [8/12/08 p.m.] 243-46) | $5,636,387.50 |
| 10-15-01 | Desert Palace (Caesars Palace and Paris) | **Chaofan and Guojun transfer for HKD 1,349,400 to Wong Hon Chee account at Desert Palace** (at foreign exchange rate of 7.75 HKD = 1 USD) (Trial Exs. 181(23) and 244 (at appendix XVI.9)) (testimony of Rob Morris, RT [8/12/08 p.m.] 243-46) | $173,891.75 |
| 10-15-01 | Desert Palace (Caesars Palace and Paris) | **Chaofan transfer for HKD 13,000,000 to Desert Palace** (at foreign exchange rate of 7.75 HKD = 1 USD) (Trial Exs. 181(23) and 244 (at appendix XVI.9)) (testimony of Rob Morris, RT [8/12/08 p.m.] 243-46) | $1,675,257.73 |
| 10-15-01 | Desert Palace (Caesars Palace and Paris) | **Chaofan transfer for HKD 815,343 to Wong Hon Chee account at Desert Palace** (at foreign exchange rate of 7.75 HKD = 1 USD) (Trial Exs. 181(23) and 244 (at appendix XVI.9)) (testimony of Rob | $105,069.97 |

| DATE | RECIPIENT | DESCRIPTION (ATTEMPTED TRANSFERS IN BOLD TYPE) | AMOUNT |
|---|---|---|---|
| | | **Morris, RT [8/12/08 p.m.] 243-46** | |
| approx. 10-15-01 | Zhen Feng Yu in San Francisco (brother of Zhen Dong Yu) | Standard Chartered wire transfer (Trial Ex. 17) (testimony of James Bonich, RT [8/19/08 a.m.] 111-12) | $1,553,000.00 |
| approx. 10-15-01 | Zhen Feng Yu in San Francisco (brother of Zhen Dong Yu) | Standard Chartered wire transfer (Trial Ex. 17) (testimony of James Bonich, RT [8/19/08 a.m.] 111-12) | $2,000,000.00 |
| **TOTAL** | | | **$20,099,174.04** |

As Zhen Dong Yu testified in the depositions played at trial, the money that Chaofan, Guojun, and Zhendong Yu had in Hong Kong were all from the funds embezzled from BOC (RT [9/20/05] 120-21). That is, the funds came from the Ever Joint Company in Hong Kong (RT [2/21/08] 94-95; RT [2/25/08] 189-90, 194). As Zhen Dong Yu testified, the funds for Ever Joint came from BOC loans that Chaofan, Guojun, and Zhendong Yu used without the authority of the borrowers or BOC. (RT [2/19/08] 28-31, 44-45, 51-59). Specifically, Ever Joint's funds were comprised of funds stolen from the BOC interbranch account, unauthorized use of customer information to obtain loans from BOC and transfer of the loan proceeds to Ever Joint, and underground currency transfers. (RT [2/19/08] 51-59).

The forensic analysis done on Ever Joint and the defendants' individual accounts in Hong Kong corroborated this

testimony.  As the forensic accounting expert, Rob Morris, testified, Ever Joint was simply a conduit for the transfer of funds and, for the most part, did not conduct actual business. (RT [8/12/08 p.m.] 196-97).  Morris' analysis of receipts related to business operations compared to total receipts showed a ratio that began as high as 40% in 1994, but declined to 10% in 1997.  (Exs. 230, 234).  Furthermore, remittances to Ever Joint from China purported to state payment for equipment or goods, but there was no documentation to that effect.  Ever Joint maintained large balances with the sub-branch, and despite debit notes reflecting interest payments from Ever Joint to BOC (which Morris' and a BOC auditor's testimony showed had indicia of fraud), in fact Ever Joint's records did not show cash being sent to BOC Kaiping except in one instance. (RT [7/1/08] 65-68; [7/2/08] 57-58; [8/12/08 a.m.] 87-90, 100-01; [8/12/08 p.m.] 134-38, 165-70, 174-75, 178-81, 192-93; Exs. 231, 238, 239, 582-590).  So-called "remittance advices" stated that the funds came out of the sub-branch, but in fact the funds came from the accounts of Kaiping Polyester and other area companies. (RT [8/12/08 p.m.] 195-96; Ex. 239).  The defendant managers caused false loans to be made in the names of local businesses and diverted loans made to a subsidiary of Kaiping Polyester (Exs. 403(3), 557).  Defendant Chaofan received from Ever Joint payments of 1.7 billion Hong Kong dollars (or $218 million) and

18

defendant Guojun received 290.9 million Hong Kong dollars (or $37.3 million).  (Ex. 239).

    This evidence shows that the funds used or intended to be used in the United States were stolen directly or indirectly from the BOC Kaiping sub-branch, transferred to Ever Joint in Hong Kong, and then used as the basis for the funds sent to the United States.  Based upon these amounts and the Ninth Circuit's opinion, the government submits the relevant Guideline calculations are as follows:

| DESCRIPTION | | | LEVELS |
|---|---|---|---|
| Base for 2S1.1 (a)(2) | Base | 8 | 30 |
| | Loss (more than $20 million) (§ 2B1.1(b)(1)(L)) | 22 | |
| | SUBTOTAL | 30 | |
| NET OFFENSE LEVEL (FOR DEFENDANTS KUANG AND YING YI YU) | | | 30 |
| Role | | | 4 (Chaofan) / 3 (Guojun) |
| Abuse of position of trust | | | 2 (Chaofan and Guojun) |
| NET OFFENSE LEVEL | | | 36 (for Chaofan) /35 (for Guo Jun) |

1    These calculations for defendants Kuang and Ying Yi Yu do
2   not affect the terms of imprisonment that they have served.  An
3   offense level of 30 and criminal history category of I
4   corresponds to a range of 97 to 121, and the 96-month term
5   previously imposed is one month below the low end of this range.
6   The new ranges for defendants Chaofan and Guojun are lower than
7   the sentences previously imposed:  for Chaofan, the applicable
8   range is 188 to 235 months, and for Guojun, the applicable range
9   is 168 to 210 months.

10  **IV.   THE FACTORS UNDER 18 U.S.C. § 3553 SUPPORT THE ORIGINAL
        SENTENCES IMPOSED THAT THIS COURT IMPOSED**

11       As established by Supreme Court's decisions in <u>United
12  States v. Booker</u>, 543 U.S. 220, 125 S. Ct. 738 (2005), and well-
13  established caselaw in the Ninth Circuit, the Guidelines are
14  only one factor to take into account in the imposition of
15  sentence under 18 U.S.C. § 3553(a).  The Ninth Circuit explained
16  the relevant procedure in <u>United States v. Carty</u>, 520 F.3d 984
17  (9th Cir. 2008) (en banc), in particular the relationship
18  between the Sentencing Guidelines and the factors described in
19  18 U.S.C. § 3553(a).  To effectuate the goal of the Sentencing
20  Reform Act to "'impose a sentence, but not greater than
21  necessary' to reflect the seriousness of the offense, promote
22  respect for the law, and provide just punishment; to protect the
23  public; and to provide the defendant with needed educational or
24  vocational training, medical care, or other correctional

20

treatment," the Ninth Circuit explained that after determining
the applicable Guideline range and hearing from the parties:

> The district court should then consider the [18
> U.S.C.] § 3553(a) factors to decide if they support
> the sentence suggested by the parties, i.e., it should
> consider the nature and circumstances of the offense
> and the history and characteristics of the defendant;
> the need for the sentence imposed; the kinds of
> sentences available; the kinds of sentence and the
> sentencing guideline range established in the
> Guidelines; any pertinent policy statement issued by
> the Sentencing Commission; the need to avoid
> unwarranted sentence disparities among defendants with
> similar records who have been found guilty of similar
> conduct; and the need to provide restitution to any
> victims.

Id. at 991 (citing 18 U.S.C. § 3553(a)(1)-(7) and Gall v. United
States, 552 U.S. 38, 128 S. Ct. 586, 596-97 n.6 (2007)).   The
Ninth Circuit also held that the sentencing court must support
any sentence outside the range by a justification, with "a major
departure supported by a more significant justification than a
minor one," and the sentencing court must explain the final
sentence "sufficiently to permit appellate review," depending
"upon the complexity of the particular case, whether the

21

sentence chosen is inside or outside of the Guidelines, and the strength and seriousness of the proffered reasons for imposing a sentence that differs from the Guidelines range." Carty, 520 F.3d at 991-92.

At the original sentencings, the Court granted the following downward variances for the defendants:

| DEFENDANT | GUIDELINE RANGE | IMPRISONMENT TERM AFTER 18 U.S.C. § 3553 VARIANCE |
|---|---|---|
| Chaofan | 65 years (based on a Guideline range of life imprisonment, which was capped at the statutory maximum) | 25 years (or 300 months) |
| Guojun | 65 years (based on a Guideline range of life imprisonment, which was capped at the statutory maximum) | 22 years (or 264 months) |
| Wan Fang Kuang | 324 to 405 months | 8 years (96 months) |
| Ying Yi Yu | 324 to 405 months | 8 years (96 months) |

For defendants Kuang and Ying Yi Yu, the recalculated range of 97 to 121 months is higher than the 8 years previously imposed, and, as discussed in the prior section, the government does not seek additional prison time for these defendants.

22

Accordingly, there need be no change in their terms of imprisonment.

For defendants Chaofan and Guojun, the recalculated ranges are lower than the terms originally imposed, and the government requests the Court to reimpose the same terms of imprisonment based upon consideration of the Section 3553(a) factors.  The first of those factors is the nature and circumstances of the offense and the history and characteristics of the defendant. 18 U.S.C. § 3553(a)(1).  As this Court noted at the original sentencing, there must be a sanction to punish individuals who commit crimes in foreign countries and flee to the United States to avoid penalty for these crimes.  (RT [5/6/09] 80-81).  As the Ninth Circuit noted, the goal of defendants' enterprise was "to steal large sums of money from [BOC] and to get away with it in the United States."  706 F.3d at 978-79.  Defendants employed the immigration fraud "to acquire the money and safely enjoy it [in] the United States, beyond the reach of Chinese law."  Id.

In doing so, defendants Chaofan and Guojun engaged numerous individuals in the United States, including the six fake spouses, the former sub-branch colleague Ding Hao who had moved to San Francisco and who helped find some of the fake spouses, a person in New York who performed a similar function in the case of fake spouse Wai Kwong Ho, and the paralegal and lawyer at the law firm in the Los Angeles area who helped arrange the fraudulent marriages.  There were elaborate measures taken to

23

execute the scheme, including the travel of the fake male

spouses from the United States to Kaiping, the staged

photographs in Kaiping and New York, the establishment of

fraudulent joint bank accounts, and the chartered plane flight

to the Los Angeles airport for fake marriages.  In addition,

defendants' conspiracy included the falsification of marriage

records in China to conceal their true marriages and the

procurement of another BOC sub-branch official and a supervisory

civil administration official to prevail on the line-level

official, Huishi Chen, to either alter documents or let them

remove the documents from the local office.  These

characteristics of what was a complex fraud scheme may properly

be considered for an upward variance.  See United States v.

Orlando, 553 F.3d 1235, 1239 (9th Cir. 2009) (history of

involvement in complex fraud schemes supported upward variance).

　　　There is a particular need for a variance here given the

need for the sentence "to reflect the seriousness of the

offense, to promote respect for the law, and to promote just

punishment for the offense."  18 U.S.C. § 3553(a)(2)(A) and (B).

The fact that defendants committed this fraud with the object to

enter the United States is also relevant because of the absence

of an extradition treaty between the United States and China.

The Ninth Circuit has noted that a defendant's knowledge of

extradition law to avoid capture is a relevant factor for an

upward variance, United States v. Lichtenberg, 631 F.3d 1021,

24

1  1027 (9th Cir.), <u>cert. denied</u>, 131 S. Ct. 2475 (2011), and the
2  analogous factor of defendants' attempt to avoid Chinese
3  prosecution by fleeing to the United States is similarly
4  relevant, given that it shows a special need to deter this
5  attempt to use the United States as a safe haven for fraudulent
6  activity by committing additional crimes in the United States.
7  In addition, defendants not only fled from China to the United
8  States, but also made efforts to conceal themselves within this
9  country by fleeing from the Los Angeles area to Kansas and
10 Oklahoma.  Indeed, upon arrest, Chaofan after being handcuffed
11 tried to run away from law enforcement agents.  These acts
12 further support a variance.  <u>Cf.</u> <u>United States v. Truong</u>, 587
13 F.3d 1049, 1052 (9th Cir. 2009) (high-speed chase supported
14 upward variance).

15     There is also a need to avoid sentencing disparities.  18
16 U.S.C. § 3553(a)(6).  The third sub-branch manager, Zhen Dong
17 Yu, received a 12-year sentence based upon his agreement, even
18 before the arrest of defendants here, to cooperate in this case
19 and to return to China to face prosecution there.  Sentences for
20 Chaofan and Guojun within the recalculated Guideline ranges of
21 188 to 235 months (for Chaofan) or 168 to 210 months (for
22 Guojun) would not properly reflect the greater need for
23 punishment for these defendants given, in Chaofan's case, his
24 greater leadership role, and in the case of both defendants, the
25 additional efforts they took to conceal themselves within the

26

27

28

country and the absence of any acceptance of responsibility, much less cooperation.

For these reasons, the government requests the Court to impose the original sentences for Chaofan and Guojun based upon the Section 3553(a) factors.

## V.  **CONCLUSION**

For these reasons, the government respectfully requests that the Court reimpose the 25-year term of imprisonment on defendant Chaofan, the 22-year term of imprisonment on defendant Guojun, and the eight-year terms of imprisonment on defendants Kuang and Ying Yi Yu.  As stated in the government's submission on restitution, the government requests the Court to impose restitution to the Bank of China for $7,813,905.75 with regard to each defendant, with each defendant jointly and severally liable with the other defendants.

26