STEVEN W. MYHRE
Acting United States Attorney
DAVID JAFFE
Acting Chief, Organized Crime &
  Gang Section
1301 New York Avenue, NW, Suite 700
Washington, D.C. 20005
Telephone: 202-353-2373
Facsimile: 202-514-3601
MARTY WOELFLE
Trial Attorney
Attorney for the Government

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Case No. 2:02-cr-00674-JCM (NJK) |
| | ) | |
| Plaintiff, | ) | CONSOLIDATED RESPONSE TO |
| | ) | RESENTENCING MEMORANDA |
| v. | ) | AND OBJECTIONS TO |
| | ) | PRESENTENCE REPORTS |
| XU CHAOFAN | ) | |
| (also known as YAT FAI HUI), | ) | |
| XU GUOJUN | ) | |
| (also known as KIT SHUN HUI), | ) | |
| KUANG WAN FANG | ) | |
| (also known as WENDY KUANG), | ) | |
| and | ) | |
| YING YI YU, | ) | |
| Defendants. | ) | |
| _____ | ) | |

Plaintiff United States of America, through counsel undersigned, hereby responds to

Sentencing Memoranda filed by defendants Chaofan Xu (ECF 934) and Guojun Xu (ECF 935), both

timely filed on June 15, 2017, pursuant to the Court's Orders (ECF 928 & 942). Defendant Ying Yi

Yu filed a motion to join defendant Chaofan's Memoranda (ECF 938). However, this pleading was

not timely filed and may be disregarded by the Court. Defendant Ying Yi's pleading does not state

any additional facts or legal authority beyond that stated by defendant Chaofan in support of her

Memoranda. As stated in the Government's Position on Resentencing (ECF 933), the United States is requesting the Court impose non-Guideline sentences in this matter under 18 U.S.C. § 3553. The following Responsive Memorandum provides further support for the Government's request, and point by point responses to the arguments made by defense counsel. As the arguments made by defendants Chaofan and Guojun are fairly similar, the United States will respond generally, and then address any individual arguments made by the defendants. The United States has no objection to the Presentence Reports, except as noted in Section VI below.

Dated: August 7, 2017.                          Respectfully submitted,

STEVEN W. MYHRE
Acting United States Attorney

DAVID JAFFE
Acting Chief, Organized Crime &
 Gang Section

_____/s/ Marty Woelfle_____
Trial Attorney

Attorneys for Plaintiff
UNITED STATES OF AMERICA

2

MEMORANDUM OF POINTS AND AUTHORITIES

I.      <u>Introduction</u>

As the Court is aware, this matter has been extensively litigated in the District Court and the Ninth Circuit. The United States will not add another recitation of the procedural history of this prosecution, but relies on the summary provided in the Government's Sentencing Memorandum (ECF 933), and the pleadings therein incorporated by reference. However, there are several points raised by the defendants which require clarification.

Defendant Chaofan Xu ("Chaofan") refers to what he characterized as "the stalled settlement offer" [ECF 934, p. 7]. This refers to ongoing efforts of the governments of the United States and the People's Republic of China to facilitate defendant Chaofan's voluntary return to China. This endeavor is modeled on a similar agreement reached between China and the U.S. that resulted in co-conspirator Zhendong Yu's voluntary return to China in May of 2004. The mechanism for defendants' voluntary return in both cases is a stipulated request for a judicial order of removal.[1] As noted by the defendant, the State Department, in consultation with the Department of Homeland Security, has been negotiating with China regarding the wording of assurances to be provided by China to the United States. The assurances concern the treatment the defendant will receive if he voluntarily returns to China.

The defendant is incorrect, however, regarding his characterization of the process and resulting agreements. The defendant states that "Chaofan must proceed through sentencing now as if no settlement was offered." (ECF 934, p. 9) In fact, there is no "settlement" in the agreement between the United States and China. The draft documents[2] have absolutely no impact on the defendant's

---

[1] The Zhendong Yu pleadings are available on PACER, Case Number 2:04-cr-00067. However, for some reason the Stipulated Request filed by the parties does not appear on the docket. A copy of the Stipulated Request is attached as Exhibit 1.

[2] Copies attached as Exhibit 2.

3

sentence in this case. There is no agreement between the United States and the defendant regarding the sentence he should receive from this Court. The only potential sentence addressed in the draft documents is the sentence that may be imposed by the Chinese government after prosecution of the defendant in his homeland. The draft stipulated request and order of removal contemplates the termination of the defendant's U.S. sentence in this case, and release of the defendant from the custody of the Attorney General and the Bureau of Prisons at the time the defendant is removed to China.

In the case of Zhendong Yu, the defendant's removal to China was accomplished as part of the defendant's guilty plea. Defendant Chaofan's guilt has been determined by his conviction at trial. The assurances that are required by the draft stipulated order of removal are stated in the special provisions to the stipulation, and not in a plea agreement. The assurances are not subject to negotiation by the defendant. The assurances are a matter of the diplomatic relations between the United States and China. Counsel for the government believes that the negotiations between the U.S. and China are nearing completion. After the State Department, in consultation with the Department of Homeland Security, determines that the assurances are adequate, the defendant will have the opportunity to determine whether he wishes to go forward with voluntary return to China under the terms of the requested stipulated order of removal and the special provisions. The defendant has no standing to require changes to the assurances, or the terms of the requested removal order. The defendant's discretion lies only in deciding to accept the terms, or not. In either case, the Court's discretion in sentencing the defendant is not in any way effected by the agreement between the United States and China. The Court may, of course, chose not to grant the proposed stipulated request for a judicial order of removal, if it is filed. That is entirely a matter for the Court to determine.

Defendant Guojun makes an interesting statement in his Memorandum [Guojun Memorandum, ECF 935, p. 15] that requires elucidation; "[u]pon release, Guojun will be reunited with his wife and their children in their Las Vegas home." According to the Department of Homeland Security ("DHS"), there are immigration holds on both defendants. Should defendant Guojun be released from custody in this case, he will be turned over to DHS for immediate deportation to China. Defendant Guojun has no immigration status in the United States, and is subject to removal because he used a fraudulently obtained visa to enter the U.S. in violation of 8 U.S.C. § 1227(a)(1)(A). Defendant Guojun's crimes of conviction are aggravated felonies, and he is subject to removal under 8 U.S.C. § 1227(a)(2)(A)(iii). Finally, defendant Guojun was present in the U.S. in violation of law, and is subject to removal under 8 U.S.C. § 1227(a)(1)(B). There is no possibility that defendant Guojun will be able to remain in the U.S. without immigration status, and he is ineligible for immigration status pursuant to 8 U.S.C. §§ 1182(a)(2)(A)(i)(I) & (a)(2)(B). Defendant Guojun will not be able to reside in Las Vegas with his family, should he be released from custody.

II.     The Sentencing Guidelines

As is now firmly established, the applicable Guideline to formulate a base offense level, under §2E1.1(a)(2), is § 2S1.1(a)(2). However, as is also firmly established, the amount of money the defendants stole from the Bank, and the amount of money then transferred to the U.S. by the defendants cannot be used to establish an amount of money to be plugged into the Table in § 2B1.1. This provides a base offense level of 8. Under § 2E1.1(a), a base offense level of 19 is to be applied if the offense level associated with the underlying RICO predicates is less than that amount. Eight is less than 19, so the base offense level for the defendants is 19. The result is the same when calculating the base offense level for the immigration crimes of conviction.

A.      Adjustments

1.      Facilitation of Passport Fraud, § 2L2.2(b)(3)(A)

Defendant Chaofan objects to the application of any role enhancements regarding his immigration crimes, specifically, a 4 level increase under § 2L2.2(a) & (b)(3)(A), because he claims he personally did not fraudulently obtain or use a U.S. passport. In support of his argument, defendant Chaofan cites U.S. v. Graves, 908 F.2d 528, 531 (9th Cir. 1990), which disallowed victim status for a DEA agent injured in the course of the defendant's arrest. Defendant Chaofan claims that the Second Superseding Indictment ("SSI") did not "otherwise specify" that the defendant was involved in passport fraud, and the 4 level enhancement therefore cannot be applied.

First, Graves is inapposite in this litigation, as it deals with the definition of "victim" under the Guideline for offenses against persons, and does not describe the parameters of relevant conduct under Chapter Three of the Guidelines. In the Graves opinion, the Circuit Court stated that the Government's argument regarding inclusion of an injury to an officer who was not the identified victim of the assault as relevant conduct was "not without force." Graves, 908 F.2d at 531. However, the Court determined that the inclusion would distort the meaning of "victim" as defined in the Guidelines. As noted by the Court in Graves, relevant conduct under § 1B1.3 includes "(1) all acts and omissions committed or aided and abetted by the defendant, or for which the defendant would otherwise be accountable, that occurred during the commission of the offense of conviction." Graves, 908 F.2d at 530. As is clear from the Commentary to § 1B1.3, "[i]n the case of jointly undertaken criminal activity, subsection (a)(1)(B) provides that a defendant is accountable for the conduct (acts and omissions) of others that was both: (i) in furtherance of the jointly undertaken criminal activity; and (ii) reasonably foreseeable in connection with that criminal activity." [Application Note 2.] [3]

---

[3] This Note, now numbered 3, is slightly different in the 2016 version of the Guidelines.

The defendant's participation in the passport fraud was specified in the SSI, and the defendant was convicted of the associated RICO Conspiracy (Count 1, Manner and Means allegations in ¶ 13, aiding and abetting allegations in Counts 10 through 15). The testimony of Tse-Yin Kwok, Huishi Chen, Zhang Lizhen, Hao Ding, Steven Cheng, Tai Wah Wong, Mei Xi Peng, Joanne Xie, Wai Kwong Ho, Fion Yu and Shanna Ma summarized in the Government's Sentencing Memo (ECF 933, pp. 18 – 28) clearly established that the defendant not only agreed that passport fraud should occur, but was actively involved in the procurement and use of falsely obtained U.S. passports. As stated by the Ninth Circuit:

> By conspiring to enter and hide out in the United States with the fruit of their ill-gotten gains, Defendants engaged in an enterprise that had the implicit goal to breach United States immigration law in furtherance of the overall goal of the enterprise. The dual parts of Defendants' enterprise were necessarily conjoined in pursuit of that goal—i.e., to steal large sums of money from the Bank of China, and to get away with it in the United States. Defendants intended to use the immigration fraud to consummate the purpose of the enterprise: to acquire the money and safely enjoy it in the United States, beyond the reach of Chinese law. Without the immigration fraud, the bank fraud would have been a dangerous failure.

U.S. v. Chao Fan Xu, (Chaofan I), 706 F.3d 965, 978-79 (9th Cir. 2013).

Defendant Guojun actively participated in the passport fraud as well. Steven Cheng, Yu Ying Yi's fake husband, testified that Guojun was present when he met his future "wife" [Trial Trans. 548, p. 68]. Cheng also testified that he borrowed money from Guojun [Trial Trans. 549, p. 16], and that he received funds in Hong Kong that were to be repaid to Guojun's parents in San Francisco [Trial Trans. 548, p. 79]. Defendant Guojun clearly knew his wife was getting a fake spouse, and there was only one possible purpose for this conduct.  The passport fraud in this case was not just foreseeable, but was a goal of the RICO Conspiracy. To apply the term "[u]nless otherwise specified" in § 1B1.3(a) as advocated by the defendant would totally eviscerate the concept of relevant conduct. It is

entirely appropriate that the 4 level increase for fraudulently obtaining or using a U.S. passport under § 2L2.2(b)(3)(A) be applied to defendants Chaofan and Guojun.

2.      Leader or Organizer, § 3B1.1(a)

Defendant Chaofan argues that he has been convicted of "a variety of overlapping money laundering conspiracies with no substance: [the Government] can show that Chaofan and his codefendants entered the conspiracies, but it cannot show that they came to anything and that any money was laundered." [ECF 934, p. 12]. This statement is flatly wrong, and flies in the face of the evidence that presented during the trial of this case. It also misstates the charges by omitting the RICO Conspiracy alleged in Count 1. Throughout his Memoranda, defendant Chaofan argues for the position that, because the Government did not establish a substantive money laundering charge under § 1957, money laundering did not occur. This conclusion goes far beyond what can be supported by the Ninth Circuit ruling. As noted by the Circuit Court, "[t]o support a conviction on the RICO conspiracy charge in count one and the money laundering conspiracy in count two, the government was required to prove that the property at issue (the funds from the Bank of China) was derived from a specified unlawful activity. The specified unlawful activity the government identified was an offense against a foreign nation involving 'fraud, or any scheme or attempt to defraud, by or against a foreign bank.'" Chaofan I, 706 F.3d at 986 (citations omitted). As further noted by the Circuit Court, "[a]t best, the government can show only that the 'vast majority' of the funds in Ever Joint accounts were fraudulently obtained." Chaofan I, 706 F.3d at 980.

The Circuit Court agreed that, based on the jury's verdicts, the Government had proven that a fraud scheme existed and that money laundering occurred. Based on the evidence presented at trial, the RICO enterprise and fraudulent scheme were both extensive and sophisticated. Certainly, there were five or more persons directly involved in the enterprise: the four defendants, coconspirators

8

Zhendong Yu and Kwong Wa Po, and the Hong Kong operators of Ever Joint and the other companies owned and controlled by the defendants, Hui Yat-sing and Wong Suet-mui. Of course, the enterprise employed the services of hundreds of individuals to execute the scheme against the Bank. Hongbin Yu, an employee of the Bank, testified that at least 60 people were involved in falsifying records at the Kaiping Sub-Branch alone. [Depo. Trans. ECF 647-3, pp. 58 – 59].  There were also those individuals who assisted in the creation of false documents in China and the United States, as well as the fake spouses who provided the defendants with a fraudulent bases for U.S. citizenship.

Coconspirator Zhendong Yu testified that Chaofan started the process of obtaining Chinese exit permits for Zhendong, Chaofan and Guojun in 1997 [ECF 648-2, p. 28]. Zhendong testified that money used by the defendants to gamble in Las Vegas was transferred to the United States by Chaofan, and that Chaofan dictated how much money Zhendong could gamble [ECF 648-2, pp. 59, 63-64]. Zhendong testified that it was Chaofan who, in October of 2001, told Zhendong that the embezzlement scheme had been discovered, and that the defendants should flee China [ECF 648-2, pp. 118 – 119]. Zhendong testified that Chaofan was his boss at Ever Joint, as well as the Bank [ECF 648-4, p. 199]. Zhendong testified that he always listened to his boss Chaofan, but the defendants lost more and more money [ECF 648-4, p. 203]. Zhendong testified that Chaofan knew much more about the amount of money the defendants lost through operation of the Enterprise, and that Chaofan had control of accounts they held in Hong Kong [ECF 648-5, p. 233]. Zhendong testified that he and Guojun were under the leadership of Chaofan in trying to hide the losses incurred by the Enterprise [ECF 648-5, p. 242]. "Cooking the books" – "At that time, we worked under him. We have no choice but follow his order. And also, the person who cooked the book is Xu Chao Fan. So he knew how the book were cooked, how the things were covered. He knew much more than I did." [ECF 648-5, p. 246, 17 – 22]. Zhendong testified that he did whatever Chaofan told him to do. [ECF 648-5, p. 247; p.

251]. Zhendong testified that Chaofan decided the size of bonuses paid from Ever Joint [ECF646-2, pp. 42-43]. Zhendong testified that he heard which investments were being made by Ever Joint from Chaofan [ECF 646-2, p. 51, 59]. Also that he learned about currency trading conducted in Hong Kong from Chaofan [ECF 646-2, p. 60]. Zhendong testified that Bank employees involved in the various parts of the scheme were under the direction of Chaofan [ECF 646-2, pp. 63-64]. Zhendong testified that all of the decisions related to the Hong Kong company operation were made by Chaofan. Guojun was in charge of the accounting and reconciliation between Kaiping and Hong Kong [ECF 646-3, p. 97]. It was Chaofan who authorized unlawful loans while president of the Kaiping Sub-Branch of the Bank [ECF 646-3, pp. 112-115]. Zhendong testified that all of the illegal loans transferred to Hong Kong were arranged by Chaofan [ECF 646-3, p. 115]. Financial transactions for gambling trips to the U.S. were arranged by Chaofan [ECF 646-4. P. 198-99].

Hao Ding, the individual who helped arrange two of the fraudulent marriages in this case, testified that defendant Chaofan asked him to find suitable people who were willing to marry, and that information regarding the arrangements was relayed back to defendant Chaofan, who provided Ding with specific instructions. Ding testified that he received funds from Chaofan for his services, and that Chaofan arranged for living quarters for the defendant wives in San Francisco after the fraudulent marriages had taken place [Trial Trans. ECF 547, pp. 26 - 40]. Given this evidence, the 4 level enhancement for leader/organizer of a criminal organization should be applied to defendant Chaofan. Additionally, it is appropriate that the 3 level enhancement for manager/supervisor (§ 3B1.1(b)) should be applied to defendant Guojun, who acted as the Enterprise accountant and gave instructions regarding the "reconciliation" of accounts between the Kaiping Sub-Branch and Hong Kong.[4]

---

[4] Defendant Guojun has not challenged the application of this enhancement.

3.      <u>Abuse of Position of Trust, § 3B1.3</u>

Defendant Chaofan objects to application of the 2 level enhancement for abuse of trust pursuant to § 3B1.3. The defendant claims that "without any actual money laundering, the enhancement does not make sense." [Chaofan Memorandum, ECF 934, p. 12.] The defendant conflates the prohibition against using a fact to establish a Guideline range with excluding a relevant fact from consideration entirely. There is absolutely no support for this position in law or in the facts of this case. Defendant Chaofan's position ignores the guilty verdicts returned by the jury, and the rulings of the Ninth Circuit: "Chaofan's objection to a two-level enhancement for abuse of a position of trust under § 3B1.3 is meritless. *See* U.S.S.G. § 3B1.3 cmt. n 1 (providing 'a bank executive's fraudulent loan scheme' as an example of abuse of trust)." <u>Chaofan I</u>, 706 F.3d at 993. As the evidence demonstrated, the illegal transfers of money from the Bank to the defendants could not have occurred without the Bank's reliance on representations made by the defendants as employees of the Bank. Indeed, according to the testimony of Hongsui Ren, an auditor for the Bank, it was only when the Bank ceased to rely on reports from the Branches and Sub-Branches in its accounting that the fraud could be detected. [Trial Trans. ECF 512, pp. 62 – 107, 110 – 142.]

Defendant Chaofan also claims that the abuse of trust adjustment cannot be applied because "Chaofan's position is not relevant conduct." [Chaofan Memorandum, ECF 934, p. 13.] The defendant again asks the Court to entirely disregard any fact or finding that the Ninth Circuit has ruled may not be used to form the basis for a Guideline calculation, in this case, conduct occurring outside the United States. As noted by the Ninth Circuit, the fact that a finding is not part of a Guideline calculation does not render the finding null and void, or beyond the reach of a sentencing Court. "The district court's findings [regarding treatment of the $20 million transferred by the defendants to the United States] are insufficient to support the government's alternative argument that

the district court considered the $20 million under 19 U.S.C. § 3553." U.S. v. Chaofan, 673 Fed. Appx. 616, 619 (9th Cir. 2016)(Chaofan II).

It does not appear that defendant Guojun challenges this enhancement, though that is not entirely clear. In his Memorandum, defendant Guojun notes two role adjustments, both cited to § 3B1.1, one for a two level enhancement, and one for a three level enhancement. [Guojun Memorandum, ECF 935, p. 14.] However, there is only one enhancement described by § 3B1.1, with separate levels for leader/organizer or manager/supervisor of the criminal organization. The correct application of § 3B1.1(b) to defendant Guojun is an increase of 3 levels, as he was a manager/supervisor of the Enterprise. It appears that the citation for an upward departure of 2 levels is miss-cited, and should be to § 3B1.3 rather than § 3B1.1. In any case, defendant Guojun does not dispute the 2 level role adjustment, and it is entirely appropriate that the abuse of trust adjustment apply to both defendants.

### 4.    Grouping, §§ 3D1.2, 3D1.3, 3D1.4

The adjusted base offense levels for the RICO Conspiracy predicates are the same pursuant to § 2E1.1(a)(1), which sets a minimum level of 19. For the immigration offenses, there would be a four level enhancement pursuant to § 2L2.2(b)(3)(A), yielding a final offense level of 23. For the fraud scheme, enhancements for role in the offense (leader/organizer and abuse of trust) would add 6 levels (one less for defendant Guojun, as a supervisor/manager), yielding a final level of 25 or 24. There are less than four levels between the two groups, so under §3D1.4(a), two levels would be added. The grouped offense level for the immigration offenses would be 25, and 27 (or 26 for defendant Guojun) for the fraud offenses.

Both defendants ask for, in essence, sentences equivalent to time served. The Government, as stated in its Sentencing Memorandum [ECF 933], is seeking an upward variance and sentences

identical to those imposed by the District Court in May of 2009 and January of 2015. This is necessary because the Guideline sentences described above do not and cannot address the unique circumstances of this case and the criteria of 18 U.S.C. § 3553. See U.S. v. Christensen, 732 F.3d 1094, 1101 (9th Cir. 2013) (Guidelines did not sufficiently account for the nature and circumstances of the offense); U.S. v. Mohammed, 459 F.3d 979, 988 (9th Cir. 2006) (sentence substantially higher than Guidelines recommendation was reasonable); U.S. v. Mix, 457 F.3d 906, 913-14 (9th Cir. 2006) (where Guidelines do not adequately take account of sentencing factors, court may impose a sentence outside and apart from the Guidelines). The application of 18 U.S.C. § 3553 is more fully discussed below.

III.    18 U.S.C. § 3553 Sentencing Factors

Title 18, U.S.C. § 3553 states, in pertinent part:

(a) Factors to be considered in imposing a sentence.--The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection. The court, in determining the particular sentence to be imposed, shall consider--
    (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
    (2) the need for the sentence imposed--
        (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
        (B) to afford adequate deterrence to criminal conduct;
        (C) to protect the public from further crimes of the defendant; and
        (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
    (3) the kinds of sentences available;
    (4) the kinds of sentence and the sentencing range established for--
        (A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines-- . . .

In this case, subsection (a)(2)(C) and (D) are not applicable to the former Bank managers.

Upon completion of whatever sentence may be imposed by the Court, defendants Chaofan and Guojun will be deported to China. Given the immigration status of the defendants, it is unlikely in the

extreme that they would ever return to the United States after deportation. The other factors, however, militate for exactly the type of sentences imposed by Judge Pro. Defendant Chaofan seeks to have the Court ignore the operation of the RICO enterprise in China, because it was "not a violation of U.S. law" and would not "promote respect for the law." [Chaofan Memorandum, ECF 934, p. 16]. In fact, the Ninth Circuit noted that "[d]efendants' fraudulent acts are unlawful in both the United States and China." Chaofan I, 706 F.3d at 987.

Contrary to defendant Chaofan's argument, the Court's consideration of *all* of the defendants' conduct is not only appropriate, it is mandated under the statute: The Court "shall consider the nature and circumstances of the offense …" 18 U.S.C. § 3553. The fact that some of the criminal conduct in this case occurred in China does not place the conduct outside the parameters of the convictions in this case, or beyond the Court's consideration. The fact that the defendants may also be punished for their crimes by the Chinese government does not preclude the Court from considering the impact of the conduct in China on the United States, and imposing a sentence that incorporates the conduct in China as a component of the crimes committed in the United States. Pasquantino v. U.S., 544 U.S. 349, 371 (2005).

As noted in the Government's Sentencing Memorandum [ECF 933], district courts have broad discretion to consider a wide range of facts to determine an appropriate sentence. This concept is codified at 18 U.S.C. §§ 3551, 3553 and 3661, and is limited by only two requirements: one, the information relied upon by the court must be accurate and supported by sufficient indicia of reliability, U.S. v. Alvarado-Martinez, 556 F.3d 732, 735 (9th Cir. 2009); and two, the information must not contradict a specific finding of fact made by a jury, U.S. v. Pimentel-Lopez, ___ F.3d ____, 2016 WL 9076502, *6 (9th Cir., June 1, 2017). The determination that a particular fact cannot be

used to calculate a sentence under the Guidelines does not make that fact disappear, or put it beyond the reach of the Court.

Defendant Chaofan argues that the Ninth Circuit has stated unequivocally that as the United States did not trace, dollar-for-dollar, the money transferred from the Bank, to Hong Kong, and then to the U.S., the $20 million that ended up in Las Vegas could not be used to calculate a Guideline sentence. This has been stated by the defendant many times, in many ways, and at this point is the law of the case. However, nowhere, in any of the arguments made by the defendant, the cases cited by the defendant, or the cases found by counsel for the Government is there any limitation on the use of the evidence submitted at trial in this matter, or the findings of the jury, by the District Court for sentencing purposes. Defendant Chaofan's argument is unsupported and flies in the face of federal statute and case law. It should not be accepted by this Court.

Defendant Chaofan argues that his offenses were primarily committed in China, and had minimal impact in the United States. [Chaofan Memorandum, ECF 934, p. 14.] Certainly, the Ninth Circuit did not espouse this view: "an inquiry into the application of RICO to Defendants' conduct is best conducted by focusing on the pattern of Defendants' racketeering activity as opposed to the geographic location of Defendants' enterprise." Chaofan I, 706 F.3d 977. "Defendants' pattern of racketeering activity may have been conceived and planned overseas, but it was executed and perpetuated in the United States." Id. at 979. "In this case, Defendants' foreign fraud was a means to violate United States laws." Id. at 987. "[T]he Defendants' immigration fraud was not a desperate attempt to cover up the bank fraud scheme. Defendants' elaborate immigration fraud scheme included false marriages involving all four Defendants who entered into the marriages before the bulk of the bank fraud even occurred. Those marriages were part of an overall plan to steal the money and get away with it in the United States." Id. at 990-91. In this case, the bank fraud scheme and the

immigration fraud are inextricably intertwined: the money was the reason for the immigration fraud, and the immigration fraud was to allow the fraudulent gains to be enjoyed by the defendants.

Defendant Chaofan argues that it would be inappropriate to impose the same sentences previously handed down by Judge Pro in this case. [Chaofan Memorandum, ECF 934, p. 15]. Defendant Chaofan states that any sentence not in line with the Guideline range makes the Guidelines irrelevant. [Chaofan Memorandum, ECF 934, p. 15.] With this argument, the defendant would make the Guidelines mandatory, and not advisory. The real question is, once the sentencing court has done an appropriate Guideline calculation and then sentenced outside the Guidelines, is the sentence substantively reasonable?

The Ninth Circuit has never reviewed the sentences in this case for substantive reasonableness. Chaofan I, 706 F.3d at 993; Chaofan II, 673 Fed. Appx. at 618. "[A] sentence outside the Guidelines carries no presumption of unreasonableness." U.S. v. Orlando, 553 F.3d 1235, 1238 (9th Cir. 2009).  In determining substantive reasonableness of a sentence, the court must consider the totality of the circumstances, including the degree of variance for a sentence imposed outside the Guidelines range. U.S. v. Carty, 520 F.3d 984, 993 (9th Cir. 2008)(en banc). In making a determination regarding a reasonable sentence in this case, the extent, sophistication, and duration of the fraud scheme should be considered as a vital factor in the totality of the circumstances of this case.

For example, in U.S. v. Chong, 240 Fed. Appx. 748 (9th Cir. 2007), the defendant was convicted of RICO and RICO conspiracy, and sentenced to 138 months. On appeal, the defendant argued that his due process rights were violated by the District Court's consideration of a murder-for-hire count on which the defendant was acquitted. The Circuit Court upheld the sentence, noting that

the District Court clearly articulated that the murder-for-hire was the basis for the upward variance, and that there was sufficient evidence to establish that the defendant caused the murder.

In U.S. v. Huy Chi Luong, 642 Fed. Appx. 694, 695 (9th Cir. 2016), the Circuit Court affirmed the defendant's 360 month sentence for RICO and money laundering violations. The Ninth Circuit stated that the upward variance from the defendant's Guideline range of 63 - 78 months was reasonable because "a sentence within the Guideline range would not reflect the seriousness of the specific money laundering offense, would not sufficiently protect the public, and would cause an unwarranted sentencing disparity between the defendants." Id. See also U.S. v. Fitch, 659 F.3d 788 (9th Cir. 2011); U.S. v. Samoza, 458 Fed. Appx. 592 (9th Cir. 2011); U.S. v. Sohnrey, 2008 WL 3861687 (9th Cir. Aug. 20, 2008); U.S. v. Shultz, 664 Fed. Appx. 610 (9th Cir. 2016).

Other Circuits have also upheld upward variances in sentencing where the Guidelines do not adequately address the criminal conduct under consideration: U.S. v. Aponte-Vellon, 754 F.3d 89 (1st Cir. 2014) (upheld sentence of 72 months for robbery, Guideline range 24 - 30 months); U.S. v. McGowan, 315 Fed. Appx. 338 (2d Cir. 2009) (sentence of 240 months, the statutory maximum, upheld for attempted receipt of child pornography where Guideline range was 87 to 108 months); U.S. v. Marisco, 578 Fed. Appx 111 (3d Cir. 2014) (upward variance for four counts of bank robbery upheld, sentence 120 months, Guideline range 63 to 78 months); U.S. v. Rivera-Santana, 668 F.3d 95 (4th Cir. 2012) (sentence 90 months above Guideline range in illegal reentry case upheld);  U.S. v. Herbert, 813 F.3d 551 (5th Cir. 2015) (Circuit Court upheld a 92 year sentence for identity theft, where the Guideline range was six to seven years); U.S. v. Monroe, 2017 WL 1149112, ___ Fed. Appx. ___ (6th Cir. Jan. 18, 2017) (Hobbs Act robbery sentence of 180 months, 70% above Guideline range upheld); U.S. v. Fogle, 825 F.3d 354 (7th Cir. 2016) (sentence 20 months above maximum Guideline sentence for child pornography upheld); U.S. v. Ruvalcava-Perez, 561 F.3d 883

(8th Cir. 2009) (Court upheld 210 month sentence, above Guideline range of 110 to 137 months); U.S. v. Lente, 759 F.3d 1149 (10th Cir. 2014) (defendant sentenced to 192 months for involuntary manslaughter and assault, Guideline range 46 to 57 months); U.S. v. Rosales-Bruno, 789 F.3d 1249 (11th Cir. 2015) (sentence of 87 months for illegal reentry upheld, Guideline range 21 to 27 months); U.S. v. Brown, 857 F.3d 403 (D.C. Cir. 2017) (144 month sentence for child pornography upheld, Guideline range 97 to 121 months).

Defendant Chaofan argues that "[w]ithout proof of actual money laundering in violation of U.S. law, Chaofan's immigration and money laundering conspiracy convictions are unremarkable." [Chaofan Memorandum, ECF 934, p. 16.] In fact there was proof of money laundering, as evidenced by the jury verdicts and the findings of the Ninth Circuit. Defendant Chaofan also argues obliquely that any sentence above the Guideline range will result in a sentencing disparity with coconspirator Zhendong Yu. [Chaofan Memorandum, ECF 934, p. 17.] Zhendong was sentenced to 144 months for his RICO conviction, and promised by the Chinese government that on his voluntary return, he would be sentenced to no more than 12 years in China. Given defendant Zhendong's early cooperation with the Government, evidenced by a motion for downward departure, a three level adjustment for acceptance of responsibility (Motion for Downward Departure, Case 2:04-cr-00067-RLH-RJJ, Doc. 11-2408401, Mar. 31, 20014), and Zhendong's lesser position in the Enterprise, there is no sentence disparity.

Defendant Chaofan seems to believe that he has some sort of right to a reduced sentence if he voluntarily returns to China. That is not correct. The agreement that would return defendant Chaofan to China prior to his serving his complete sentence in the United States provides only that his U.S. sentence would terminate at the time he leaves U.S. jurisdiction. The agreement between the United States and China is a matter of the diplomatic relationship and law enforcement cooperation between

18

the two countries. There is no belief on the part of the U.S. government "that Chaofan would be punished enough if he returned to China to face limited punishment there." [Chaofan Memorandum, ECF 934, p. 18.] The only "belief" held by the United States regarding this case is that the sentences imposed by Judge Pro are reasonable, and should be re-imposed by this Court.

IV.    <u>Restitution</u>

Both defendants claim that there is no basis for restitution to the Bank, and that no restitution should be ordered by this Court. Defendant Guojun argues that the Bank is not a "victim" under the Mandatory Victim Restitution Act ("MVRA"), 18 U.S.C. § 3663A. Defendant Guojun argues that the Ninth Circuit's rulings in this case "suggest that the MVRA does not apply extraterritorially in this case." [Guojun Memorandum, ECF 935, p. 17]. However, the Ninth Circuit has expressly declined to determine the application of the MVRA to foreign sovereigns. <u>In re Her Majesty the Queen in Right of Canada</u>, 785 F.3d 1273 (9th Cir. 2015). In that case, the defendant was convicted of defrauding the United States under 18 U.S.C. § 371, money laundering conspiracy, wire fraud, and making false statements related to the Clean Air Act. The fraudulent scheme involved the false generation of renewable fuel credits, false representations regarding the type of fuel being sold, and the export of biodiesel without retiring or purchasing renewable energy credits. Canada filed a mandamus action after the district court denied its claim for restitution for amounts paid to a Canadian company owned by the defendant based on false statements regarding the production of biodiesel. The Circuit Court dismissed the mandamus action, finding that, while the Canadian scheme had elements in common with the charged fraud scheme, they were in fact different. "The schemes were accomplished by different means, had different victims, and took place primarily in different countries. They were linked too tangentially to be part of the same 'scheme, conspiracy, or pattern of criminal activity.'" <u>In re Her Majesty</u>, 785 F.3d at 1277 quoting § 3363A(a)(2). The Circuit Court noted specifically that

whether a foreign sovereign is a "person" who may be a "crime victim" under 18 U.S.C. 3771(e) was an open question in the Circuit. Id.

Other Circuits have held that foreign sovereigns are indeed victims under the MVRA. In U.S. v. Bengis, 631 F.3d 33 (2d Cir. 2011), the Circuit Court ruled that the government of South Africa was entitled to restitution for the value of lobsters illegally taken from South African waters. The Circuit Court found that "the defendants' criminal conduct 'directly harmed' the South African government which in turn makes South Africa eligible for restitution under the VWPA [Victim Witness Protection Act, 18 U.S.C. § 3663] and MVRA." Id. at 41. In that case, the District Court ordered the defendants to pay the government of South Africa $22 million in restitution. U.S. v. Bengis, 611 Fed. Appx. 5, 6 (2d Cir. 2015).

Even the case cited by defendant Guojun in support of his argument, U.S. v. Onwuzulike, 488 Fed. Appx. 208 (9th Cir. 2012), upheld the payment of restitution to foreign persons located outside the jurisdiction of the United States. The Circuit Court stated that "the district court did not plainly err" in construing the MVRA to apply to foreign persons. Id. at 211.

The Ninth Circuit has held that the United States Postal Service and various county government entities qualified as "victims" under the MVRA. U.S. v. De La Fuente, 353 F.3d 766 (9th Cir. 2003). The MVRA itself identifies the United States as a potential "victim" under the Act. "The enforcement provision of the MVRA explicitly recognizes the government as a possible victim. See 18 U.S.C. § 3664(i) ('*In any case in which the United States is a victim*, the court shall ensure that all other victims receive full restitution before the United States receives any restitution.')" U.S. v. Mei Juan Zhang, 789 F.3d 214, 216 (1st Cir. 2015) (emphasis in original)). There is no legal basis in the MVRA for exempting a foreign sovereign that has suffered a direct loss as the result of criminal conduct from "victim" status under the Act. In this case, the Bank has suffered a loss in excess of

$400 million, directly caused by the fraud scheme operated by the defendants. The restitution requested by the United States represents a fraction of that amount that was transferred to the United States. The defendants should be held liable for repayment of this money to the Bank under the MVRA.

Defendant Chaofan argues that the Bank was not harmed by the defendants' conduct, because the harm occurred before any money was laundered. [Chaofan Memorandum, ECF 934, p. 19]. This statement ignores the scope of the counts of conviction in this case: RICO Conspiracy, Money Laundering Conspiracy, and Conspiracy to Transport Stolen Monies. The calculation of loss in this case, and therefore the amount of restitution, is all loss "reasonably foreseeable in connection with [jointly undertaken] criminal activity." U.S. v. DiRoberto, ___ Fed. Appx. ___, 2017 WL 1276440, p. *5 (9th Cir. Apr. 5, 2017). "Where the amount of loss is the result of 'jointly undertaken criminal activity,'—such as a conspiracy—the relevant amount of loss must be determined on the basis of 'all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity, that occurred during the commission of the offense of conviction.'" U.S. v. Treadwell, 593 F.3d 990, 1002 (9th Cir. 2010). In this case, it was not only "reasonably foreseeable" that laundered funds would end up in the United States: it was the ultimate goal of the scheme. Limitation of the restitution amount to funds that were actually illegally transferred to the United States makes any argument regarding extraterritoriality application of the VWPA and MVRA much less persuasive. The focus of the definition of "victim" in the statute focuses on proximate case of the harm resulting in loss, not the geographic location of the victim. There is, as stated, no indication in the MVRA of intent to exclude victims located overseas from the right to restitution.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

V.      Forfeiture

Both defendants object to forfeiture in this case. [Chaofan Memorandum, ECF 934, P. 19; Guojun Memorandum, ECF 935, p. 19]. The defendants treat this issue based on a putative new forfeiture order by this Court. That is not necessary or appropriate, as the defendants did not substantively appeal the original order of forfeiture in this case; the time for appeal of that order has long passed. Under Ninth Circuit precedent, a district court does not have jurisdiction to hear a defendant's challenge to an order of forfeiture where the defendant appealed his conviction and sentence, but did not appeal a preliminary forfeiture order. U.S. v. Bennett, 147 F.3d 912, 914 (9th Cir. 1988).

Pursuant to Fed. R. Crim. Pro. 32.2(b)(4)(C), the time for the defendant to file an appeal from a forfeiture order begins to run when judgment is entered. Judge Pro ordered the defendants to file notices of appeal within 10 days of the entry of judgment, ECF 816, p. 76. While the defendants filed notices of appeal that referred to all judgments by the District Court [Chaofan Notice, ECF 756, Guojun Notice ECF 759], the defendants did not address forfeiture in either of the appeals in this case, and the Ninth Circuit did not consider or enter orders regarding forfeiture in this case when the convictions were upheld. Therefore, the forfeiture order cannot now be challenged in the District Court.

Further, forfeiture was mandatory in this case. Under 18 U.S.C. §§ 982 and 1963, district courts are required to order forfeiture when the Government makes the required showing. Criminal forfeiture is separate from restitution, and is not dependent on a particular loss calculation. U.S. v. Newman, 659 F.3d 1235, 1241 (9th Cir. 2011). The forfeiture in this case was tied specifically to amounts of cash and jewelry found in the possession of the defendants at the time of their arrests, see

Attachment A to Final Order of Forfeiture, ECF 821, filed Dec. 15, 2009.[5] Property obtained during the execution of a scheme to defraud is appropriately subject to forfeiture. U.S. v. Lo, 839 F.3d 777, 793 (9th Cir. 2016) (forfeiture appropriately includes property from "additional executions of the scheme that were not specifically charged or on which the defendant was acquitted").

Defendant Guojun argues that he cannot be held jointly and severally liable for forfeiture pursuant to Honeycutt v. U.S., 137 S.Ct. 1626 (2017). Honeycutt applies specifically to forfeiture in drug prosecutions under 21 U.S.C. § 853, and the substitution of assets not personally acquired by the defendant under joint and several liability. Honeycutt is not applicable in this case, because the United States did not seek substitute assets, nor was the forfeiture based on joint and several liability. The forfeiture in this case was for specifically listed property, found in the possession of the defendants, not involving any third parties. There are no "untainted" assets in this case.

Additionally, forfeiture in this case was sought and granted under 18 U.S.C. § 1963, which includes a very broad definition of property in a RICO enterprise that is subject to forfeiture, including "any property constituting, or derived from, any proceeds which the person obtained, directly or indirectly, from racketeering activity." 18 U.S.C. § 1963(a)(3). The statute also contains a "relation back" provision that vests all right and title to any property described in subsection (a) in the United States, 18 U.S.C. § 1963(c). Therefore, the ruling in Honeycutt cannot be applied in this case.

Defendant Chaofan argues that there is no forfeitable property in this case because "[t]he RICO Act cannot be applied to any of the activities in China, and without tracing, there is no racketeering activity in the United States that would provide any proceeds." [Chaofan Memorandum, ECF 934, pp. 19-20.] The defendant relies on RJR Nabisco v. E.U., 136 S.Ct. 2090 (2016). What the defendant does not acknowledge is that the Court abrogated Chaofan I in its ruling, finding that RICO

---

[5] The United States has agreed to turn over the forfeited property to the People's Republic of China, after all appeals are exhausted. Order, ECF 819, Nov. 13, 2009.

had extraterritorial application in specific circumstances. Id. at 2099. While the Ninth Circuit has ruled that the fraud scheme executed by the defendants in China cannot be used to formulate a Guideline sentence, the District Court is fully authorized by federal statute, and the Ninth Circuit case law discussed above, to consider the racketeering conduct in formulating an appropriate sentence under 18 U.S.C. § 3553.

Further, "[f]orfeiture is an aspect of the sentence not an element of the underlying crime. Accordingly, a district court or jury need only find facts warranting forfeiture by a preponderance of the evidence." U.S. v. Christensen, 828 F.3d 763, 822 (9th Cir. 2015)(citations omitted). And, where forfeiture is mandated, as it is in this case, district courts have no discretion to reduce or eliminate criminal forfeiture. U.S. v. Phillips, 704 F.3d 754, 769 (9th Cir. 2012). There is no basis in law or fact for any change to the Final Order of Forfeiture entered by Judge Pro in this case.

## VI.    Objections to Revised Presentence Reports

The United States has no objection to the factual information provided in the revised PSRs. Regarding the Guideline application, the Probation Officer has included the amount of money the defendants transferred or attempted to transfer to the United States (more than $20,000,000 but less than $50,000,000) as part of the calculus [Chaofan and Guojun PSRs at ¶ 69; Wan Fang Kuang PSR, ¶ 70; Yu Ying Yi PSR, ¶ 70]. While there is clearly a basis under the Ninth Circuit ruling for inclusion of this amount in the sentence calculation under 18 U.S.C. § 3553, the decision in Chaofan II, it appears that the laundered funds cannot be considered in formulating a Guideline sentence unless the Court makes a finding that such is proper under the statute: "The district court's findings are insufficient to support the government's alternative argument that the district court considered the $20 million under 18 U.S.C. § 3553."

Regarding defendant Wan Fang Kuang, as state earlier, she has been deported to China, and will in all likelihood never re-enter the United States. The United States has requested that the Court either defer defendant Kuang's sentencing indefinitely, or dismiss the restitution portion of the case against defendant Kuang without prejudice [ECF 937, June 28, 2017]. Regarding defendant Yu Ying Yi, she has been denaturalized and is authorized for removal to any country that will accept her except China.

VII.    Conclusion

As demonstrated by its history, this is not a simple case. The issues are complicated and expansive in scope. However, at this stage of the litigation, matters have been narrowed to consideration of the sentencing factors in 18 U.S.C. § 3553. The defendants seek to limit the Court's sentencing discretion to conduct that occurred in the United States: there is no basis for such a limitation in law or in the facts of this case. On the contrary, it is the impact on the United States of the defendants' extraterritorial conduct that requires the Court to consider all aspects of the RICO Enterprise and the fraudulent schemes operated by the defendants.

The defendants further seek to limit the Court's sentencing discretion to specific benchmarks set by the advisory Sentencing Guidelines. There is no support for this position, and Ninth Circuit precedent that states that district courts may not ascribe a presumption of unreason to sentences outside Guideline ranges. The sentence in this matter must be determined under § 3553, and is therefore entirely within the discretion of the Court.

This case is almost unique in the scope of the criminal conduct it includes. Given this fact, it is entirely appropriate that the Court not be bound by the advisory Guidelines. This case is so large that it can best be compared with other enormous fraudulent schemes, such as that perpetrated by

Bernie Madoff.  As stated by the Hon. Judge Denny Chin regarding the sentence he imposed in that case,

> any sentence above 20 or 25 years would be largely, if not entirely, symbolic. But symbolism is important, for at least three reasons. First, retribution. One of the traditional notions of punishment is that an offender should be punished in proportion to his blameworthiness. Here, the message must be sent that Mr. Madoff's crimes were extraordinarily evil, and that this kind of irresponsible manipulation of the system is not merely a bloodless financial crime that takes place just on paper, but that it is instead, as we have heard, one that takes a staggering human toll. The symbolism is important because the message must be sent that in a society governed by the rule of law, Mr. Madoff will get what he deserves, and that he will be punished according to his moral culpability.
>
> Second, deterrence. Another important goal of punishment is deterrence, and the symbolism is important here because the strongest possible message must be sent to those who would engage in similar conduct that they will be caught and that they will be punished to the fullest extent of the law.
>
> Finally, the symbolism is also important for the victims. The victims include individuals from all walks of life. The victims include charities, both large and small, as well as academic institutions, pension funds, and other entities. Mr. Madoff's very personal betrayal struck at the rich and the not-so-rich, the elderly living on retirement funds and social security, middle class folks trying to put their kids through college, and ordinary people who worked hard to save their money and who thought they were investing it safely, for themselves and their families.

U.S. v. Bernard L. Madoff, Case No. 09 CR 213, S.D.N.Y., June 29, 2009 (sentencing transcript, copy attached as Exhibit 3).

While there are no direct individual victims in this case, the loss of almost half a billion dollars is significant, even to a country as rich as the People's Republic of China. We cannot determine the impact on individual Chinese citizens, who may have been impacted by the Bank's loss, perhaps by the failure of a publicly-funded health clinic, or denial of public housing. However, the breach of trust in this case is the same: the defendants used their positions as Bank employees to steal from the Bank, hand over fist. The defendants then made the United States an unaware accomplice in their fraud schemes, exploiting U.S. immigration law by lying and paying others to lie for them. The scope of the immigration fraud in this case is equally expansive. U.S immigration programs were used in the most cynical fashion, with the defendants taking advantage of provisions

designed to keep families together in order to avoid Chinese law enforcement and the consequences

of their enormous theft.

As stated by Judge Pro during the first sentencing in this case (addressing specifically

defendant Chaofan):

> The seriousness of the crimes cannot be understated or ignored. The economic loss to the Bank of China was enormous and in all probability unrecoverable. The corruption of those under the direction of the defendant was substantial and violated the laws, and his violations of the laws of the United States were also numerous, as reflected in the six counts of conviction. Faced with criminal charges in this country, he enjoyed the procedural rights that every defendant has in a criminal prosecution and he now properly should face the penalties that appropriately are imposed for his crime.

> In my view, failure to impose a severe penalty would not promote respect for the law; it would diminish it. There has to be a substantial consequence for substantial misconduct. It cannot be ignored. A just sentence is necessary to deter not only the defendant, but others from future criminal conduct. Crimes of fraud and money laundering are not victimless crimes, neither are the visa fraud, passport fraud-type violations in this particular case, or the transportation or conspiracy to transport stolen monies.

> Everyday in this country, and I'm sure in others, people act in disregard for those laws and engage in criminal conduct, but at the end of the day there are real victims of such fraudulent schemes, in the form of individuals, whether they be taxpayers, or employees of a company, investors in a company who suffer. There damage is very real and a harsh sentence in a case like this is warranted in light of that.

> The public has to be protected from such crimes, and the most effective way of deterring others, it seems to me, from engaging in such huge criminal conspiracies as we have here, it was orchestrated by the particular defendant, is by imposing a severe penalty, which clearly communicates to others that if they engage in similar illegal conduct, the consequences will be similarly severe.

> * * *

> The final factor that creeps into my analysis in determining the sentence is something that I mentioned earlier, and it separates this case somewhat from those other fraud cases that I've mentioned that were committed by people in the United States who were working for companies in the United States in one role or another. The defendants here were not - - Defendant Xu Chao Fan was not, and the relevant conduct with regard to the underlying bank - - fraud took place in the country of China. But as I stated earlier, that is something that I think weighs against the defendant in terms of sentence, not in his favor, because this conduct, which notwithstanding the argument that it was culturally acceptable, which I reject, I find was engaged by the defendant with knowledge that it was wrong, not with knowledge of a particular law in the United States, to be sure he would have no way of knowing that, and

27

perhaps not cognizant of a particular statute or regulation in China, which again is not determinative, but to allow a circumstance where an individual or individuals can engage in conspiracies and fraudulent schemes such as that presented here in another country, and then escape to the United States in this case and avoid criminal penalty, avoid consequences or penalty of any kind for such conduct, which is continued in the United States.

And in the process of doing that, by committing new crimes in the United States involving laundering money - - conspiracy to launder money, racketeering, transportation of stolen monies, and the various fraud conduct involving use of fraudulently obtained visa, as set forth in Counts IV, V and VI, which are most clearly violations of the laws of the United States and would bear separate consequences, all weigh in favor of a severe penalty because anything less would encourage others to do the same thing and to seek the same kind of refuge.

Transcript, ECF 816, May 6, 2009.

For the reasons stated above, the United States requests that the Court re-impose the sentences imposed by Judge Pro in this case on May 6, 2009, and January 15, 2015.

CERTIFICATE OF SERVICE

I hereby certify that on August 7, 2017, the foregoing was filed with the Clerk of the Court to

be served by operation of the Court's electronic filing system upon the following:

Mario D. Valencia
Law Office of Mario D. Valencia
1055 Whitney Ranch Drive, Suite 220
Henderson, NV 89014
Counsel for defendant XU Chaofan

Amy B. Cleary
Office of the Federal Public Defender
411 E. Bonneville, Suite 250
Las Vegas, NV 89101
Counsel for defendant XU Guojun

Chad A. Bowers
The Law Office of Chad A. Bowers, Ltd.
3202 W. Charleston Blvd.
Las Vegas, NV 89102
Counsel for defendant KUANG Wan Fang

Travis E. Shetler
Travis E. Shetler, P.C.
844 East Sahara Avenue
Las Vegas, NV 89104
Counsel for defendant YU Ying Yi

_____/s/ Marty Woelfle_____
Trial Attorney
Organized Crime & Gang Section